UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,                    :

            Plaintiff,                         : CV 05-2848 (CBA)(KAM)

     -   against -                                   :

BARRY HERTZ,                                           :

            Defendant.                         :
-----------------------------------------------------------------------X

**REPLY MEMORANDUM OF DEFENDANT BARRY HERTZ IN FURTHER
SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO THE SEC'S CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT**

Orans, Elsen & Lupert LLP
Robert L. Plotz
Leslie A. Lupert
875 Third Avenue, 28th Floor
New York, New York 10022
(212) 586-2211

*Attorneys for the Defendant*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ……………………………………………………..... ii

Preliminary Statement ……………………………………………………….... 1

ARGUMENT ……………………………………………………………….…. 2

POINT I       THE INFORMATION IN THE DEFENDANT'S
POSSESSION WAS NOT MATERIAL AS A
MATTER OF LAW, AND SO THE DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
SHOULD BE GRANTED ……………………………………………… 2

          A.      The Evidence Is Undisputed That
The MX Revenues Were Steadily Declining
Starting In 2001 And Continuing
Through 2003 ……………………….………………………..….. 2

          B.      The MX Revenue Information Was Not Material
As A Matter Of Law ……………………………………………….. 4

POINT II     THE SEC'S CROSS-MOTION FOR SUMMARY
JUDGMENT SHOULD BE DENIED …………………………....….. 12

          A.      There Is No Provable Relationship Between
The Movement Of The Price Of Track Data
Stock And The Public Disclosures …………………………….. 13

          B.      Consideration Of Remedies Is Premature ………………….…... 17

CONCLUSION …………………………………………………………….....… 20

## TABLE OF AUTHORITIES

**CASES**                                                               **Page**

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ……………………………………...…. 6

*Commodities Futures Trading Comm'n v.*
*Commodities Fluctuation Sys.,* 583 F.Supp. 1382
(S.D.N.Y. 1984) ……………………………………………………………….…. 18

*Commodities Futures Trading Comm'n v.*
*Incomco, Inc.,* 580 F.Supp. 1486 (S.D.N.Y. 1984) ……………………….…...…. 18

*Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) ……………………………. 11

*Elkind v. Liggett & Meyers, Inc.,* 635 F.2d 156 (2d Cir. 1980) …………………....…. 8

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ……………………..……… 5

*Geiger v. Solomon-Page Group, Ltd.*,
933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) ……………………………..……… 10

*In re Burlington Coat Factory Sec. Lit.*,
114 F.3d 1410 (3d Cir. 1997) ……………………………………………… 9

*In re Kidder Peabody Sec. Litig.,*
10 F. Supp.2d 398 (S.D.N.Y. 1998) …………………………………………... 5

*In re Seagate Tech. II Secs. Litig.*, No. C-89-2493,
1995 WL 66841 (N.D. Cal. Feb. 8, 1995) ……………………………..……… 10

*Larez v. City of Los Angeles*,
946 F.2d 630, 643-44 (9th Cir. 1991) …………………………………………… 10

*Metzner v. D.H. Blair & Co.,*
689 F.Supp. 262 (S.D.N.Y. 1988) …………………………………………..…… 11

*Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ……………………………..…… 9

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
185 F. Supp.2d 389 (S.D.N.Y. 2002) …………………………………..……... 5

*SEC v. Bausch & Lomb, Inc.,*
420 F. Supp. 1226 (S.D.N.Y. 1976) ………………………….…………...…. 5, 6

**CASES**                                                                                    **Page**

*SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8 (2d Cir. 1977) ……………………………. 8, 10

*SEC v. Falbo*, 14 F. Supp.2d 508, 522 (S.D.N.Y. 1998) …………………………..……… 9

*SEC v. Farrell*, No. 95-CV-6133T,
   1996 WL 788367 (W.D.N.Y. Nov. 6, 1996) …………………………….………. 19

*SEC v. Hoover*, 903 F. Supp. 1135 (S.D. Tex. 1995) ……………………………... 6, 7, 9

*SEC v. Lund*, 570 F. Supp. 1397 (C.D. Cal. 1983) …………………………………… 9

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) ……………………………………………… 9

*SEC v. Murphy*, 626 F.2d 633 (C.A. Cal. 1980) …………………………………………… 5

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ………………………………………..……….. 19

*SEC v. Patel*, No. 93 CIV. 4603 (RPP), 1994 WL 364089
   (S.D.N.Y. July 13, 1994) ……………………………………………………………… 19

*SEC v. Price Waterhouse*, 797 F.Supp., 1217 (S.D.N.Y. 1992) ……………………….. 18

*SEC v. Soroosh*, 166 F.3d 343 (9th Cir. 1998) ………………………………………..……… 9

*SEC v. Smath*, 277 F.Supp.2d 186, 188 (E.D.N.Y. 2003) ………………...…………… 19

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) ………………………………………...……… 9

*U.S. v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) …………………………………….… 8, 10

**STATUTES AND RULES**

H.R. Rep. No. 100-910 (1988) …………………………………………………………… 19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,                    :

             Plaintiff,                                     :  CV 05-2848 (CBA)(KAM)

    -  against -                                    :

BARRY HERTZ,                                           :

             Defendant.                                     :

-----------------------------------------------------------------------X

## REPLY MEMORANDUM OF DEFENDANT BARRY HERTZ IN FURTHER SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE SEC'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

This memorandum of law is respectfully submitted (a) in reply to the answering memorandum of the plaintiff Securities and Exchange Commission ("SEC") and in further support of defendant Barry Hertz's motion for summary judgment and (b) in opposition to the SEC's cross-motion for partial summary judgment.

### Preliminary Statement

Mr. Hertz's motion for summary judgment rests on the straightforward point that Track Data's repeated public disclosures about declining revenues of its MX product line were consistent with the actual revenue numbers in Mr. Hertz's possession when he made the sales in issue. No matter how many pages of rhetoric from the SEC, the issue is no more complicated than whether having the actual numbers is material when the public has been repeatedly told what those numbers will be. We say no and the SEC says yes.

The SEC, in its cross-motion for partial summary judgment, has needlessly attempted to complicate a simple case by submitting an expert affidavit from one of its

former employees, Robert Comment, who unsuccessfully tries to tie stock price movement to the public disclosures, but this type of proof is only relevant if the SEC has first established materiality through other evidence, which it has not done. See Point I(B), *infra*. However, should the Court disagree, we are submitting the expert report of Ronald Quintero, which demonstrates that it is not possible to find that the nonpublic information at issue in this case caused any movement in Track Data's stock price. If the Court decides that it needs to consider the expert reports, then a hearing should be held (preceded by depositions of the two experts) at which the experts will testify; all the other material evidence is undisputed.[1]

## ARGUMENT

**I.     THE INFORMATION IN THE DEFENDANT'S POSSESSION WAS NOT MATERIAL AS A MATTER OF LAW, AND SO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED.**

### A. The Evidence Is Undisputed That The MX Revenues Were Steadily Declining Starting In 2001 And Continuing Through 2003

The SEC concedes that the nonpublic information in Mr. Hertz's possession at the time he made the July and November sales at issue consisted of monthly revenue figures for the MX product, the core product.  The graph set forth on page 10 of our opening memorandum shows that, starting in late 2001, the revenues from the MX product had steadily declined in a virtual straight line (Main Br. at 10) and the public disclosures in each of its relevant earnings announcements were that this declining trend would

---

[1] There is another aspect of the case, relating to the SEC's allegations that the defendant tipped certain relatives. As the Court was advised at the premotion conference, discovery relating to this issue would be expensive. If the Court grants the defendant's motion for summary judgment, that would dispose of the case and that discovery would never be necessary. If the Court decides to hold the expert hearing as discussed above, this other discovery would still only become necessary if the Court, after the hearing, were to rule that the nonpublic information the defendant had in his possession at the time of the July sales was material.

continue. The SEC now argues that the decline in MX revenues in the second quarter of 2003 "was far steeper than had occurred during the months of the first quarter." (SEC Br. at 20). This is the basis of its argument that the nonpublic detailed revenue information Mr. Hertz had differed materially from what the public had been told.

In making this argument, the SEC relies on the third page of Pl. Ex. 7, which, in addition to a monthly breakdown of MX revenues, contains another line, called "ADJ. REV/VAR.," which deducts so-called "credits issued" from the MX revenues. (For the Court's convenience, the third page of Pl. Ex. 7 is attached as an addendum at the back of this brief.)  The SEC's contention is that the "ADJ. REV/VAR." line shows a steeper decline between the first two quarters of 2003 that is inconsistent with the public disclosure of an even decline.  As the Court will note, the first line is the actual amount of MX revenues, which does show a straight-line decline from month to month, as the graph in our opening brief shows.   Had the SEC asked any of the Track Data witnesses at their depositions about the "Adj.Rev" line on this exhibit, it would have learned that the "Adj.Rev" line does not show anything about the actual MX revenues or sales for the period reflected.  As made clear by the accompanying affidavit of Martin Kaye, the chief operating officer and chief financial officer of Track Data, the large credit for January 2003 and about two-thirds of the smaller one for February 2003 all pertain to sales in 2002 and therefore have nothing to do with the sales or revenue trends for those months in 2003, shown on the first line of the exhibit. (Kaye Aff. ¶4.) Mr. Kaye was examined by the SEC during its investigation, and while he was shown this document, he was never asked anything about the "credits." (Def. Ex. 14 at 70-74.) As Mr. Kaye explains, these credits reflect the processing of adjustments made with customers relating to sales in

3

earlier periods.  For example, a customer might be given a credit because it may have been billed for the wrong number of units, or an exchange may have been billed in error, or some other mistake may have been made.  The total amount of these credits usually does not vary by a huge amount month to month, and in any event not in relation to the trend in the sales of the MX product (that is, the amount of the credits did not change in a straight line from 2001 to the present, as the decline in revenues did).  (Kaye Aff. ¶3.)[2]

In short, the documentary evidence demonstrates exactly what Mr. Hertz has argued and what Track Data disclosed at the time – MX revenues were steadily declining in a virtual straight line, and the revenue numbers in the emails received by Mr. Hertz were therefore not material.  Nor is Track Data's trading policy relevant (*see* SEC Br. at 14.).  Even if the sales in question violated that policy, which we do not concede, that does not establish a violation of the securities laws.  Those laws are violated only if Mr. Hertz in fact was in possession of material nonpublic information at the time of the sales which, as we have shown, he was not.

**B.    The MX Revenue Information Was Not Material As A Matter Of Law**

The SEC's legal argument is no sounder than its description of the factual record. In response to our argument that nonpublic information that merely corroborates publicly disclosed information is not material (Main Br. at 16-19), the SEC cites a string of cases that stand for the unexceptional proposition that earnings information can often be material.  (SEC Br. at 18-19.)  From this straightforward principle the SEC makes the

---

[2] The SEC also makes much of the insertion of the word "significant" in the press releases accompanying disclosure of the second and third quarter earnings, arguing that addition of this word indicated that the decline in revenues had changed for the worse in these quarters.  But, as noted in text, in fact the MX revenues maintained their steady decline, and so the word "significant" simply does not have the meaning ascribed by the SEC.  Moreover, even using the SEC's incorrect numbers, the decline in third quarter revenues did not change in kind from the second quarter, yet the word "significant" was used in the third quarter press release as well.  The SEC's hypertechnical reading of the press releases is faulty.

leap to argue, without any citations to relevant cases or other authorities, that, regardless

of the circumstances, "information relating to earnings and dividends is inherently

material" (SEC Br. at 18), by which the SEC presumably means such information is *per*

*se* material.  This, however, is not the law, and the cases cited by the SEC do not stand

for this proposition; rather, they simply say that this type of information *could* be

material.  For example, in *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000)

(cited by the SEC at p.19 of its brief), the Second Circuit considered the nature of the

allegedly material information along with a number of other factors.  In fact, the SEC in

citing this case omitted the beginning of the quoted sentence, which actually reads,

"misstatements of income *could be material* because 'earnings reports are among the

pieces of data that investors find most relevant to their investment decisions.'"  *Id.* at 164

(emphasis added).

　　　The other cases cited by the SEC similarly do not announce a *per se* rule and do

not involve a situation like ours, where there was public disclosure of an earnings trend

which was entirely consistent with the actual numbers in the possession of the trader.  *See*

*SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) (fact that success of partnerships in

which public invested over $7 million depended upon the ability of defendant's company

to raise additional capital was material and should have been disclosed in partnership's

offering documents); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 185 F. Supp.2d

389, 400 (S.D.N.Y. 2002) (shareholder securities fraud suit alleging company's failure to

disclose the fact that it was the subject of an FTC investigation); *In re Kidder Peabody*

*Sec. Litig.,* 10 F. Supp.2d 398, 410 (S.D.N.Y. 1998) (shareholder securities fraud suit

alleging that corporation reported false profits); *SEC v. Bausch & Lomb, Inc.,* 420 F.

Supp. 1226, 1233 (S.D.N.Y. 1976) (determination of materiality cannot be made in a vacuum but must be measured against the circumstances).

None of these cases supports the SEC's argument that the information Mr. Hertz possessed was material as a matter of law simply because it involved earnings information. To the contrary, the law is as we set it forth in our opening brief. The SEC and we agree that materiality is governed by the Supreme Court's holding in *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal citations and quotations omitted), that for a fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." This requirement of significance and substantiality recognizes that all information, even relating to earnings, is not material; if it were otherwise, a corporate insider could never trade in his company's stock unless he first flooded the marketplace with "an avalanche of trivial information [causing] a result that is hardly conducive to informed decision making." *Id*. at 231.

We cited a number of cases in our opening memorandum that stand for the proposition that nonpublic information that simply corroborates or is consistent with information that has been disclosed to the public, does not alter the mix of publicly available information and is therefore not material. (Main Br. 17-19.) With virtually no discussion, the SEC dismisses these cases, which it brought and lost, on the basis that the defendant had not personally seen actual performance figures. The SEC has misinterpreted the actual holdings in these cases.

*SEC v. Hoover*, 903 F. Supp. 1135 (S.D. Tex. 1995), is most instructive. The general counsel of Browning Ferris Industries, Inc. ("BFI") was told by the assistant

6

controller, whose department had prepared an internal mid-month earnings report, that the analysis showed the company's annual earnings could be as much as 12% below the prior year's rather than 10% as had been disclosed in the most recent 10-Q, *id.* at 1142, and that the controller wanted to change the projection in the next public disclosure, *id.* at 1143. The SEC argued in *Hoover* that the mere fact that BFI's financial department wanted to revise its earnings estimate downward was material. *Id.* at 1144. The court conducted an extended analysis of BFI's prior disclosures and concluded that the "total mix" of information available was that BFI's financial performance in the fiscal year was negative, based on its reported earnings, public projections and public statements, which included the statement that "trends experienced to date are expected to continue throughout the remainder of fiscal 1991." The *Hoover* court held that the materiality of the information that, based on actual earnings, the estimate of annual earnings was going to be revised downward, had to be measured in the context of the prior public statements. *Id.* at 1145. Ultimately, the court concluded that the additional downward revision of the earnings estimate was not inconsistent with the public disclosures and was therefore not material. *Id.* at 1145-46 & 1148. The decision did not turn on whether the defendant had personally seen the nonpublic earnings data, and, in fact, he had been told of the information and the conclusions that were being drawn from it.

Material information is in any event not limited to hard numbers; rather, it is the total mix of information, including projections, estimates and the like. There is simply no basis for the SEC's attempt to distinguish the instant case from the cited cases on the basis that the nonpublic information here consisted of actual numbers, not projections. After all, material information comes in many forms. Even rumors in certain

circumstances can constitute material information. *Elkind v. Liggett & Meyers, Inc.,* 635 F.2d 156, 162-63 & n.8 (2d Cir. 1980).  Most significantly, we have found no case – and certainly the SEC has cited none – in which nonpublic "hard" numbers about revenues that were consistent with publicly disclosed figures or trends, as in this case, were found to be material.

The SEC also argues that the movement of the Track Data stock price the day after the earnings announcements in August and November evidences the materiality of the news.  The cases the SEC cites, however – many of which are the same cases cited by us -- do not rebut our argument that stock price movement alone cannot establish materiality (*see* Main Br. at 19-23).  Thus, the SEC argues, correctly, that in an efficient market stock price is generally affected by the disclosure of material information.  (SEC Br. at 24.)  Both the case law and common sense support this proposition.  The converse -- that movement of stock price determines materiality -- hardly follows, however, and neither the case law nor common sense supports such an argument.

The rule in the Second Circuit is as enunciated in *U.S. v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), and *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8 (2d Cir. 1977) (both cases cited by both the SEC and the defendant).  Thus, "whether a public company's stock price moves up or down or stays the same after the filing of [a disclosure] *does not establish the materiality of the statements made*, though stock movement is a factor the jury may consider relevant." *Bilzerian*, 926 F.2d at 1298 (emphasis added).  Indeed, in *Bausch & Lomb*, the court held that even a considerable drop in stock price did *not* demonstrate materiality as the movement of the stock price was not unusual for the stock

8

and there were other factors. 565 F.2d at 15-16. This is precisely the situation in this case.

The cases cited by the SEC do not stand for the proposition that stock price movement, standing alone, demonstrates materiality. What they do stand for is the proposition that stock price movement can corroborate the materiality of information as to which there is other evidence of materiality or, conversely, lack of stock price movement confirms lack of materiality. *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (materiality of information about contemplated tender offer "confirmed" by jump in price after disclosure); *SEC v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997) (new information about serious ongoing merger negotiations where CEO about to negotiate new contract with merged entity demonstrates materiality, "a conclusion . . . buttressed by" stock price movement); *SEC v. Falbo*, 14 F. Supp.2d 508, 522 (S.D.N.Y. 1998) (information about impending tender offer was clearly material); *SEC v. Hoover*, 903 F. Supp. 1135, 1147 (S.D. Tex. 1995) (lack of materiality determined in part by lack of stock price movement); *SEC v. Lund*, 570 F. Supp. 1397, 1401 (C.D. Cal. 1983) (proposed joint venture material because it would have significant effect on assets and earnings potential; stock movement confirmed conclusion); *SEC v. Soroosh*, 166 F.3d 343 (9th Cir. 1998) (knowledge of problems with disclosures affecting one-third of revenues was material; stock movement confirmed this); *In re Burlington Coat Factory Sec. Lit.*, 114 F.3d 1410, 1425 (3d Cir. 1997) (lack of effect on stock price shows lack of materiality); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (same).

There is thus no basis as a matter of law for the SEC's argument that the movement of Track Data's stock price after the second and third quarter earnings releases

demonstrates the materiality of anything in those releases.  This Court should therefore

follow the lead of Judge Koeltl of the Southern District of New York who, following

*Bilzerian* and *Bausch & Lomb*, dismissed a complaint on motion because "[e]vidence of

stock price movement may be relevant to the issue of materiality but it is not

determinative."  *Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1188

(S.D.N.Y. 1996).  As Judge Koeltl observed, "[t]he stock price may have fallen for many

reasons . . . .  [T]hat evidence is not sufficient by itself to demonstrate the materiality of

the omission."  *Id.*[3]

The SEC tries to buttress its argument by pointing to a routine wire service report,

released after the August earnings announcement, that the SEC says attributed the decline

in the stock price to a weak earnings report.  (SEC Br. at 21.)  But the SEC cites no

authority for the proposition that a news report like the one cited carries any evidentiary

weight at all. To the contrary, press reports are inadmissible hearsay if offered to prove

the truth of the information reported in them.  *See In re Seagate Tech. II Secs. Litig.*, No.

C-89-2493, 1995 WL 66841, at *5 (N.D. Cal. Feb. 8, 1995) (news article was

inadmissible hearsay if offered to prove that defendant made statement attributed to him

in the article, and court granted summary judgment) (citing *Larez v. City of Los Angeles*,

946 F.2d 630, 643-44 (9th Cir. 1991)). Indeed, there is even less basis in this case to

consider the news reports than in these  cases.  In each of those cases, the news report

quoted a defendant or corporate officer, but the quotes were held to be inadmissible

---

[3] While the movement of the Track Data stock price is insufficient as a matter of law to demonstrate
materiality, it is worth noting here that Mr. Hertz's expert has shown that Track Data's stock price
historically has not reacted in any predictable way to earnings announcements.  The price has gone up and
down following positive announcements, and it has gone up and down following negative announcements.
Quintero Aff. ¶18 & Ex. 8,10,11. This is yet an additional reason that the evidence of stock price
movement in this case proves nothing about materiality.

hearsay. Here, the SEC goes much farther afield and asks the Court to consider the hearsay opinion of a non-expert journalist as to why the stock price moved. The reporter has no direct knowledge and no greater ability that anyone else to divine what, if anything, caused the stock price to move. In short, "[n]ewspaper articles are inadmissible hearsay." *Metzner v. D.H. Blair & Co.,* 689 F.Supp. 262, 266 n.6 (S.D.N.Y. 1988). *See also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).[4]

The SEC also misstates Mr. Hertz's argument on this point. As clearly set forth in our opening brief, we argued that no *analysts* covered Track Data stock and no *analysts* focused on Track Data's earnings *before* the announcement, and hence there was no analyst coverage that could arguably have shaped investor expectations *in advance of* the earnings announcement. (Main Br. at 11.) The fact that a reporter writes a routine, after-the-fact report based substantially on Track Data's press release proves nothing.

The above discussion also disposes of the SEC's argument that the information about the issuance of the penny dividend was material. While dividend information may be considered important as a general matter, it is not *per se* material. Here, where the disclosure of the dividend clearly stated that it was being issued simply in response to a change in the tax laws, and the disclosure was made just days after another negative earnings announcement, it cannot credibly be argued that such a small dividend in these circumstances represented a signal that the company's fortunes had suddenly changed. This is especially so inasmuch as the dividend was just an alternative use for cash that

---

[4] While not necessary to decide the issue, it is worth noting that the press report cited by the SEC (Pl. Ex. 17) is a five-line wire-service note that makes no attribution of cause but simply reports the drop in share price "as the Company reported revenues." A headline writer changed the reporter's word "as" to "on," but the mere fact that a headline writer says something after-the-fact with which the SEC subsequently agrees does not make it either admissible or relevant.

11

was already being used in the company's stock buyback program.[5] Just as with the

earnings announcements, the movement of the stock price after the announcement of the

dividend, and what some journalist wrote about it after-the-fact, do not prove

materiality.[6]

## II.   THE SEC'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

Because there is no support for its materiality argument, the SEC's cross-motion

for partial summary judgment must be denied, and its expert report must be rejected

because it deals solely with stock-price movement, which we have demonstrated is

insufficient by itself to prove materiality. If the Court disagrees, it should nevertheless

reject the SEC's expert report because its conclusions make no sense.  We concede,

however, that if the Court decides that it cannot grant Mr. Hertz's summary judgment

motion as a matter of law, it would have to hold a hearing preceded by depositions of the

two sides' experts.

As set forth in the Rebuttal Affidavit of Ronald G. Quintero, the defendant's

expert, the SEC's expert Robert Comment has conducted an inadequate analysis:  his

"event study" does not prove that the nonpublic information was material and he has

proved no link between the press releases at issue and the movement of Track Data's

---

[5] The SEC suggests that the dividend could have had a different effect on current shareholders deciding whether to hold or sell than on investors deciding whether to buy.  (SEC Br. at 23-24 n.11.)  This distinction is illusory.  In either case, the investor is making a decision about whether or not to own Track Data stock after a certain date.

[6] In any event, as with the news report after the August 12 press release, the cited news story (Pl. Ex. 18) does not support the SEC's position, even if it were permissible to consider it on the merits.  The report cited the company's declining revenues and referred to the "discrepancy" between paying a dividend and those earnings.  It further quoted a Track Data spokesman as conceding that the company could not sustain the penny dividend if its performance continued as it had been.  In fact, the company has paid only one dividend since this first one.  It is difficult to see this press report as reflecting anything close to bullish sentiment.

stock price. The SEC's expert tries to prove the unprovable -- that the one statement the SEC has latched onto about declining MX revenues in press releases, that contain many other pieces of news, caused the price of the stock to change. But, as shown below, historically Track Data stock often went *up* when bad news was released, and often went *down* when good news was released. Moreover, during the relevant time frame in the summer of 2003, there was huge trading in the stock, which was unprecedented and had absolutely nothing to do with news from the company. Mr. Comment also tries to compare little Track Data with its $40 *million* of total 2003 revenues (and only part of which is a broker-dealer) with the movement of stock of giant broker-dealers like Morgan Stanley ($35 *billion* in 2003 revenues), Merrill Lynch ($27 *billion*) or even Charles Schwab ($4 *billion*). These giants are mostly owned by sophisticated institutions (for example, Morgan Stanley is 64.4% owned by institutions, Merrill Lynch 70.7% and Charles Schwab 59.2%) while institutions own only 1.7% of Track Data's stock. To argue that Track Data's stock behaves similarly to the stock of these giants makes no sense on its face.

### A.     There Is No Provable Relationship Between The Movement Of The Price Of Track Data Stock And The Public Disclosures

As Mr. Quintero shows, historically there has not been a meaningful relationship between the operating performance of Track Data and the performance of its stock price in the market. For example, the stock price was at its highest level of the decade during the first quarter of 2000 when the company was losing money and revenues were lower than those of the following year. In contrast, as revenues and/or earnings rose during the next four quarters, the stock price plummeted. Quintero Aff. ¶18. Similarly, in the second through fourth quarters of 2002, Track Data's revenues and earnings increased

13

but its stock price fell. *Id.* Then, during the third quarter of 2003, the period of primary concern in this case, during a period of continuing erosion in quarterly revenues and earnings comparisons, the stock price shot up significantly. *See* Quintero Aff. Ex. 8, 10.

Mr. Comment did an "event study" in an attempt to show that information disclosed on four selected dates in 2003 was material. His study quantified the obvious: on the four days he selected, which were the days after press releases issued by Track Data, the price of Track Data's stock moved a significant amount. Comment Decl. ¶27. What was not said by Mr. Comment is that Track Data's stock price routinely moved up or down by large amounts day-to-day even in the absence of any new, relevant information about the company. Indeed, as Mr. Quintero shows, in the six-year period ending in December 2003, the daily stock price change of Track Data stock exceeded 2.5% nearly 60% of the time. Quintero Aff. ¶20 and Table 2. 2.5% was approximately double the yield on a one-year CD during the second half of 2003. The daily stock price changed more than 10% over 10% of the time during this six-year period. *Id.* As Exhibit 12 to Mr. Quintero's affidavit shows, even during the period in 2003 covered by the four dates Mr. Comment selected, Track Data stock regularly moved up or down by large amounts based on no news. In other words, large daily stock movement was the norm for Track Data.

Mr. Comment has tried to buttress his conclusion by comparing the performance of Track Data common stock to that of an index of broker-dealer securities as well as of companies he describes as "like" companies. Because the fluctuations of Track Data's stock price on the four dates deviates from those of the index and the "like" companies, Mr. Comment concludes that he has made a statistically significant finding. His

14

conclusion is fundamentally flawed, however, because the benchmarks chosen are irrelevant. The broker-dealer index he used is comprised of leading broker-dealers like Morgan Stanley, Merrill Lynch and Charles Schwab, with billion-dollar market capitalizations, all of which are well-established in the industry. Quintero Aff., Ex. 13. Track Data's broker-dealer business, by contrast, is new, very small, and constituted a minority of Track Data's historical revenues as of the summer of 2003. Both the index and the "like" companies are therefore subject to entirely different fundamentals. Quintero Aff. ¶23.

In fact, a comparison of the stock price fluctuations of Track Data and the index shows that they follow independent patterns that often deviate radically from one another and any correlation is statistically insignificant. Quintero Aff. ¶24. The 18 so-called "like" companies are also radically different from Track Data in scale and the nature of their operations, so their stock prices too will be affected by different fundamentals. This is borne out by comparing their stock prices, which are even less correlated to Track Data's than the broker-dealer index. Quintero Aff. ¶¶25-26 & Ex. 16-17. Accordingly, the fact that Track Data's stock price may have acted differently from Mr. Comment's chosen benchmarks in 2003 simply reflects that Track Data's stock price generally acts differently from the benchmarks, but it says nothing about the reasons why it did so in 2003.

Nor does Mr. Comment's hypertechnical parsing of Track Data's press releases demonstrate the materiality of the MX revenue information. As set forth above, Track Data's stock was volatile and historically did not react in a predictable way to company press releases. As Mr. Quintero has shown, sometimes the stock price moved up after a

15

positive press release, sometimes it moved down. Conversely, sometimes it moved down on negative news, sometimes it moved up. Quintero Aff. ¶18 and Exhibit 11. Accordingly, in addition to the overall volatility of Track Data's stock, there has been no historical correlation between disclosures of company financial developments and stock price movement. Thus, the movement of the stock price on the days after the press releases in 2003 does not demonstrate materiality.

Mr. Quintero shows that Mr. Comment fails in his attempt to prove that the various 2003 press releases caused the stock price movement. In particular, with respect to the August 12, 2003 press release disclosing second quarter earnings, Mr. Comment has sifted through the numerous items disclosed in the release and concluded that only the one item that helps the SEC -- disclosure of the professional segment including MX revenues -- caused the drop in stock price that day. Comment Decl. ¶10,11,12. As Mr. Quintero demonstrates, Mr. Comment ignored the drop in the stock price of Track Data that began on July 25, and the substantial increase in the stock price by August 19, just a few days after the press release, all on *no* additional news about the company. If the market were so precise in valuing Track Data stock, its stock price would not have increased in the absence of new information. Quintero Aff. ¶29.

Moreover, the nonpublic MX revenue information at issue in this case could not have driven the decline in stock price. First, that information did not depart from its historical trends and the market has never demonstrated an ability to link financial information about Track Data to value. Quintero Aff. ¶33 and Exhibit 10, 18. As Mr. Quintero observes, the decline in MX revenues "reveals as consistent a trend in declining revenues as is likely to be found in the real world." Quintero Aff. ¶33. Thus, Mr.

16

Comment's conclusions about how the market would have treated each of the many disclosures in the August 12 press release, lacks any foundation in the history of the market's evaluation of this company and is nothing more than rank speculation.

Nor is Mr. Comment's argument that the August 25, 2003 press release announcing the penny dividend caused an increase in the stock price persuasive. Payment of a dividend does not create value for shareholders; rather, it simply distributes value from the company to the shareholders, but at a cost to shareholders of creation of a tax obligation. In the context of a stock price that often fluctuates more than 10% per *day* and more often than not more than 2.5% per *day* (twice the 1.3% per *year* dividend yield calculated by Mr. Comment, *see* Comment Decl. ¶21), a one-time penny dividend is immaterial. Quintero Aff. ¶35. This is reinforced by the fact that the company did not commit to paying future dividends (and, in fact, has paid a dividend only once since then) *Id.*, and that the money to pay the dividend came from funds that had been earmarked for use in the company's buyback program. Further, in the absence of any news, Track Data's stock price registered double-digit increases within a few days before and after the August 25 press release. *Id.* and Ex. 8. There is no basis other than speculation to attribute the August 25 stock price increase to the August 25 press release.

### B.    Consideration Of Remedies Is Premature

The SEC in its brief argues what remedies should be adopted if the Court were to grant its cross-motion. (SEC Br. at 30-35.) As set forth above, we submit the SEC's motion should be denied, and so the issue of remedies need not be reached. Even if the Court granted the SEC's motion, however, consideration of remedies is premature because the Court would then have to consider the part of the SEC's case as to which

17

there has been no discovery – that is, whether the defendant tipped any family members about any material nonpublic information in July 2003. As previously set forth, the defendant emphatically denies these allegations.

It is worth noting here, however, that the scope of the remedies sought by the SEC is inappropriate. For example, a permanent injunction is unnecessary. Although not the only factor favoring Mr. Hertz, courts of the Second Circuit have found that defendants were unlikely to commit repeated violations where their violation was not intentional or reckless, the defendant ceased its improper conduct immediately, the incidence of misconduct was infrequent, or the misconduct comprised only a tiny part of the defendant's business. *SEC v. Price Waterhouse,* 797 F.Supp., 1217, 1243 (S.D.N.Y. 1992) (no injunction where defendants acted in good faith, made no other violations before or after SEC contact, and had not ignored compliance issues brought to their attention); *Commodities Futures Trading Comm'n v. Commodities Fluctuation Sys.,* 583 F.Supp. 1382, 1386 (S.D.N.Y. 1984) (less than 4% of company's business attributable to associated company in which fraudulent acts occurred); *Commodities Futures Trading Comm'n v. Incomco, Inc.,* 580 F.Supp. 1486, 1490 (S.D.N.Y. 1984) (defendant "did not intentionally or recklessly violate the statute"; no further improprieties; "few incidents of supposed misconduct must be viewed against the backdrop of . . . uncontroverted 9,000 plus compliances during the past three years"). Here, particularly where at most the transactions were done based on a misapprehension of the law, and Mr. Hertz did not sell any of his own substantial holdings or profit on any of the transactions, a permanent injunction is unnecessary.

For similar reasons, it would serve no purpose permanently to bar Mr. Hertz from acting as an officer or director of any public company under 15 U.S.C. §§ 77t(e) and 78u(d)(2). (SEC Br. at 32-33.) The Second Circuit considers six factors relevant to whether a defendant is unfit to serve as an officer or director: (1) the "egregiousness" of the securities law violation at stake; (2) whether the defendant is a "repeat offender"; (3) the defendant's role in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood of recurrence. *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). Courts have refused to impose such bars even where the defendant has been convicted of criminal offenses and sentenced to jail. *See id.*, 61 F.3d at 141-42 (2d Cir. 1995); *SEC v. Farrell*, No. 95-CV-6133T, 1996 WL 788367, at *8 (W.D.N.Y. Nov. 6, 1996). As the Second Circuit said in *Patel*, court must show more than a mere likelihood of future misconduct to justify such a ban. *Patel*, 61 F.3d at 142. Here, the SEC cannot show even that much.

Finally, civil penalties are unnecessary here. They are intended to "augment the current methods of detection and punishment" of insider trading "where . . . deterrence fails." H.R. Rep. No. 100-910, at 7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043, 6044. (SEC Mem. at 34-35.) If the equitable penalties already imposed are sufficient to meet the need for deterrence, the court may refuse to order civil penalties. *SEC v. Smath*, 277 F.Supp.2d 186, 188 (E.D.N.Y. 2003); *SEC v. Patel*, No. 93 CIV. 4603 (RPP), 1994 WL 364089, at *3-4 (S.D.N.Y. July 13, 1994), *rev'd in part on other grounds,* 61 F.3d 137 (2d Cir. 1995). Civil penalties are unnecessary in this case and would be "unduly harsh and unnecessary." *Patel*, 1994 WL 364089 at *3.

While we believe the Court will never need to reach the issue of remedies, we reserve the right to submit a more comprehensive memorandum on the issue at the appropriate time.

## CONCLUSION

For the reasons set forth in this memorandum of law and our opening memorandum, Mr. Hertz's motion for summary judgment dismissing the complaint should be granted, and the SEC's cross-motion for partial summary judgment should be denied.

Dated: New York, New York
          January 13, 2006

ORANS, ELSEN & LUPERT LLP

By:_____
          Robert L. Plotz
          Leslie A. Lupert
          875 Third Avenue, 28th Floor
          New York, New York 10022
          (212) 586-2211
          *Attorneys for the Defendant*

20

**Addendum to Brief**

Track Data (U.S.A.)
MX Division
Trend Analysis with Y.T.D. Totals

| REVENUE CLASS | JAN.03 FINAL COOK | FEB.03 FINAL COOK | MAR.03 FINAL COOK | APR.03 FINAL COOK | MAY.03 FINAL COOK | JUN.03 FINAL COOK | Y.T.D. GROSS |
|---|---|---|---|---|---|---|---|
| TRACK DATA U.S.A. | 1,861,666.00 | 1,819,167.00 | 1,768,919.00 | 1,760,937.00 | 1,665,460.00 | 1,610,229.00 | 10,476,368.00 |
| CREDITS ISSUED(gross) | (130,582.00) | (46,766.00) | (30,745.00) | (26,302.00) | (12,439.00) | OPEN | (236,824.00) |
| ADJ. REV/VAR | 1,731,084.00 | 1,772,401.00 | 1,738,174.00 | 1,734,635.00 | 1,653,021.00 | 1,610,229.00 | 10,239,544.00 |

| VAR./Prod./ Item | JAN.03 FINAL COOK | FEB.03 FINAL COOK | MAR.03 FINAL COOK | APR.03 FINAL COOK | MAY.03 FINAL COOK | JUN.03 FINAL COOK | REVENUE |
|---|---|---|---|---|---|---|---|
| MX | 815,405.00 | 795,021.00 | 777,921.00 | 766,406.00 | 719,786.00 | 683,657.00 | 4,558,196.00 |
| MX/OPT COMBO | 5,010.00 | 4,400.00 | 4,400.00 | 3,600.00 | 3,600.00 | 4,900.00 | 24,610.00 |
| NEWSWATCH | 4,848.00 | 4,966.00 | 5,008.00 | 4,928.00 | 4,673.00 | 4,284.00 | 31,265.00 |
| MX_FEAT | 1,867.00 | 1,867.00 | 1,867.00 | 1,755.00 | 1,755.00 | 1,755.00 | 10,866.00 |
| MARKETRACK | | | | | | | |
| OPTRACK | 37,485.00 | 37,635.00 | 42,035.00 | 39,170.00 | 37,690.00 | 38,865.00 | 230,780.00 |
| MON/CONFIG/KYBD | 41,175.00 | 40,325.00 | 39,275.00 | 37,650.00 | 35,975.00 | 35,050.00 | 229,450.00 |
| MICROHEDGE | | | | | | | |
| TOG | | | | | | | |
| TOGPLUS | | | | | | | |
| DDE | 7,050.00 | 6,050.00 | 6,100.00 | 6,650.00 | 5,600.00 | 4,900.00 | 36,250.00 |
| COMMINETHR | 224,173.00 | 219,081.00 | 213,866.00 | 208,866.00 | 203,290.00 | 200,311.00 | 1,269,307.00 |
| A.P.I. | 13,525.00 | 12,800.00 | 12,625.00 | 12,275.00 | 11,970.00 | 16,570.00 | 79,565.00 |
| STORAGE | 4,808.00 | 4,630.00 | 4,630.00 | 4,630.00 | 4,630.00 | 4,284.00 | 27,612.00 |
| EXCHANGES | 255,320.00 | 248,563.00 | 238,554.00 | 242,866.00 | 234,691.00 | 224,512.00 | 1,440,536.00 |
| 3RD PARTY DIB | 307,684.00 | 300,499.00 | 287,827.00 | 285,018.00 | 271,827.00 | 254,789.00 | 1,707,654.00 |
| EXCH. FEE B/BILL | 512.00 | 705.00 | 465.00 | 458.00 | 362.00 | 181.00 | 2,683.00 |
| 3RD PTY DIB B/BILL | 1,609.00 | 1,390.00 | 465.00 | 1,200.00 | 665.00 | 465.00 | 5,734.00 |
| INSTALLATION | | 400.00 | 1,250.00 | 400.00 | 600.00 | 1,920.00 | 4,570.00 |
| MISC/OT CHGS. | 16,501.00 | 23,500.00 | 16,607.00 | 14,820.00 | 16,740.00 | 15,974.00 | 103,142.00 |
| HARDWARE | 12,754.00 | 12,254.00 | 12,054.00 | 12,019.00 | 10,999.00 | 10,079.00 | 70,159.00 |
| PLOT | | | | | | | |
| SALES TAX | 99,118.00 | 96,898.00 | 93,943.00 | 92,875.00 | 88,737.00 | 86,254.00 | 557,823.00 |
| LATE FEES | 13,612.00 | 8,463.00 | 12,087.00 | 15,651.00 | 12,060.00 | 12,123.00 | 73,976.00 |
| CREDITS ISSUED(gross) | (130,582.00) | (46,766.00) | (30,745.00) | (26,302.00) | (12,439.00) | OPEN | (236,824.00) |
| VARIATION (SUM) | 1,731,084.00 | 1,772,401.00 | 1,738,174.00 | 1,734,635.00 | 1,653,021.00 | 1,610,229.00 | 10,239,544.00 |